## INTERNATIONAL MANUFACTURING COMPANY

v.

## The UNITED STATES.

### No. 216–64.

United States Court of Claims.

July 20, 1967.

John M. Barnes, Jr., Boston, Mass., for plaintiff. Burton L. Williams, Boston, Mass., attorney of record.

Edward B. Greensfelder, Jr., Washington, D. C., with whom was Asst. Atty. Gen., Mitchell Rogovin, for defendant. Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, JONES, Senior Judge, and LARAMORE, DURFEE, DAVIS, SKELTON, and NICHOLS, Judges.

OPINION

PER CURIAM.

This case was referred to Trial Commissioner Lloyd Fletcher with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in a report and opinion filed on June 3, 1966. Plaintiff filed exceptions to the commissioner's findings of fact and conclusion of law; defendant took no exceptions and requested the court to adopt them as its findings of fact and conclusion of law. The case was submitted to the court on oral argument of counsel and the briefs of the parties. Since the court is in agreement with the opinion, findings and recommendation of the commissioner, with slight modifications, it hereby adopts the same as the basis for its judgment in this case. The standard applied in the trial commissioner's opinion is fully consistent with that announced in Van Norman Industries, Inc. v. United States, 361 F.2d 992, 176 Ct.Cl. 16 (1966), cert. denied, 386 U.S. 981, 87 S.Ct. 1285, 18 L.Ed.2d 229 (1967). Plaintiff is, therefore, not entitled to recover and its petition is dismissed.

OPINION OF COMMISSIONER *

* The opinion, findings of fact, and recommended conclusion of law are submitted under the order of reference and Rule 57(a).

FLETCHER, Commissioner.

Simply stated, the primary issue which divides the parties here is whether portable baby seats and beds (also referred to herein as "bassinets") manufactured by plaintiff are automobile "parts or accessories" so as to be subject to the manufacturers' excise tax levied by section 4061(b) of the 1954 Internal Revenue Code. With respect to similar articles manufactured by one of plaintiff's competitors, the United States District Court for the District of Massachusetts has held that the tax applied. Rose-Derry Co. v. United States, 243 F.Supp. 26 (D. Mass., 1965).

For many years the plaintiff, a Massachusetts corporation, has specialized primarily in the designing and manufacturing of portable baby furniture which it has marketed under the registered trademark "Teddy Tot." For the quarter-year, July 1, 1959 through September 30, 1959, the defendant determined that six of the items manufactured by plaintiff were subject to the eight percent excise tax on automobile accessories. Thereafter, on September 20, 1963, a tax of $3,508.53 was assessed and paid.[1] Upon the failure of defendant to allow plaintiff's timely claim for refund, plaintiff brought this suit.

In its 1959 sales catalog, plaintiff advertised and described the six items asserted by the Government to be taxable, as follows:

(1). Catalog No. 79. This item was given the name "Zip-Apart Car-Bed" and was described as "The Newest—Most Original—The Safest—Most Beautiful Car-Bed in History." Among the "exclusive features" claimed for it were that it was the "only car-bed that can be used with perfect safety in both the front and back seat of car," that it had a built-in safety strap, and that by simple use of the zipper mechanism, it could be quickly changed "from a car-bed to a car chair."

(2). Catalog No. 32. This item was given the name "Convertible Car-Bed."

It was claimed to be the "only car-bed with a permanently attached guard rail" and that it "quickly and easily converts to car seat by means of special spring-lok." Its legs extend vertically "for use in front or rear seat of car" and horizontally "to steady bed at home."

(3) and (4). Catalog Nos. 67 and 68. These two items were substantially the same except for differences in fabric colors and the use of a steel guard rail on No. 67. They were described as "Traveling Hi-Chair and Car Seat," and were equipped with a feeding tray and simulated steering wheel. They were claimed to be convenient for visiting friends, in restaurants, or at home. According to the advertisement, the "plastic covered car and hi-chair hooks will never mar upholstery."

(5). Catalog No. 66. This item was given the name "Co-Pilot." It was described as a car seat which "doubles as Hi-Chair at home, visiting, or at restaurants." It came equipped with a simulated steering wheel, gear shift, and beep horn.

(6). Catalog No. 490. This item was called the "Little Tot Safety Chair" and was described as "a strong, safe dependable car chair" with "plastic covered auto and hi-chair hooks."

Both the "auto and hi-chair hooks" just referred to were standard equipment on all the above-described baby chairs or seats. The "auto hooks" were comparatively large, horseshoe-shaped, hooks attached to the back of the baby chair with ample diameter for fitting either over the back of standard upholstered furniture found in living rooms and hotel lobbies, or over the back of the front passenger seat in an automobile. Also, these hooks were of sufficient size that they could conveniently be used to attach the baby chair to the typical adult passenger seats found in commercial aircraft, passenger trains, and buses.

The "hi-chair hooks," on the other hand, while also horseshoe-shaped and at-

1. Plaintiff had not included such excise tax in the price of the articles sold and has never collected the tax from any of its vendees.

tached to the back of these baby chairs, were much smaller in diameter. They obviously were intended for use in hanging the seat on the typical straight-backed, non-upholstered, chair frequently found in kitchens and restaurants. The larger "auto hooks" in no way impaired the latter use of the baby chair.

The baby beds described in plaintiff's catalog had only the large "auto hooks" attached to them. The beds, however, had metal legs which were of an ingenious design whereby they could be extended (for purposes of stability) either vertically, or horizontally. Essentially, the vertical extension was designed so that a user could adjust the legs to accommodate the unevenness of the modern automobile floor. The horizontal extension, on the other hand, was intended to provide stability for the bed when it was placed on a flat surface such as the floor of a home.

The above-described products were designed by Abraham G. Goldberg, now deceased, who was the founder of the plaintiff company, and by his son, Morris I. Goldberg, who is now plaintiff's president. Both men were ingenious designers in the field of baby furniture, and they developed novel features for their products on which several patents were granted by the U. S. Patent Office. As in the case of the catalog descriptions and other advertising material, the patent applications filed by the Goldbergs clearly indicate that they considered the primary use for the beds and seats was in automobiles. For example, Catalog No. 79, supra, is described in the catalog as being covered by U. S. Patent Nos. 2,269,109 and 2,730,163. Patent No. 2,-730,163 was issued by the Patent Office on January 10, 1956, for what is described in the application as a "Convertible Bassinet and Child's Chair for Automobiles," and the first paragraph of the application states:

This invention relates to a bassinet which can be used either inside or outside of an automobile, and which is constructed so that it can be converted into a child's chair for supporting a child within an automobile.

Throughout other patent applications in evidence, similar indications of primary use in automobiles are found along, however, with statements that, in case of an item such as Catalog No. 490, supra, the chair "may also be supported upon the back of a chair, sofa, or other type of furniture, or other suitable support." U. S. Patent No. 2,508,822.

During the period here involved, the 1954 Code in section 4061(b) imposed an eight percent excise tax on the sale of "parts or accessories" for automobiles. The quoted phrase was defined by section 48.4061(b)–2(a) of the pertinent regulations, insofar as relevant here, as follows:

* * * The term "parts or accessories" includes (1) any article the primary use of which is to improve, repair, replace, or serve as a component part of an automobile truck or bus chassis or body, or other automobile chassis or body, or taxable tractor, (2) any article designed to be attached to or used in connection with such chassis, body, or tractor to add to its utility or ornamentation, and (3) any article, the primary use of which is in connection with such chassis, body, or tractor, whether or not essential to its operation or use. * * *

In subsection (d) of the above regulation, examples are given of articles taxable as automobile parts or accessories. Included among such examples are "baby seats for automobiles, automobile beds, automobile hammocks, etc." Plaintiff vigorously disputes the applicability of the foregoing regulations to any of its products.

The starting point, all would agree, is the Supreme Court's decision in Universal Battery Co. v. United States, 281 U.S. 580, 50 S.Ct. 422, 74 L.Ed. 1051 (1930). There the Court considered the validity of the predecessor regulations

to section 48.4061(b)–2, supra, and stated:

This construction of those terms [i. e. "parts" and "accessories"] has been adhered to in the Internal Revenue Bureau for about ten years, and it ought not to be disturbed now unless it be plainly wrong. We think it is not so, but is an admissible construction. Certainly it would be unreasonable to hold that articles equally adapted to a variety of uses and commonly put to such uses, one of which is use in motor vehicles, must be classified as parts or accessories for such vehicles. And it would be also unreasonable to hold that articles can be so classified only where they are adapted solely for use in motor vehicles and are exclusively so used. Magone v. Wiederer, 159 U.S. 555, 559, 16 S.Ct. 122, 40 L.Ed. 258. We think the view taken in the administrative regulations is reasonable and should be upheld. It is that articles primarily adapted for use in motor vehicles are to be regarded as parts or accessories of such vehicles, even though there has been some other use of the articles for which they are not so well adapted. 281 U.S. 583–584, 50 S.Ct. 423.

From this language plaintiff contends that the test of taxability of an item as an automobile part or accessory does not turn upon the actual use of the item but rather upon the use for which it is "primarily adapted." While agreeing that all the items in question are adaptable for use in automobiles and are in fact so used, plaintiff insists that it has clearly proved the equal adaptation of these items for use in other means of transportation, at travel destinations, and in the home.

From the record in this case it is indisputable that plaintiff's products can be, and are, used for purposes other than automobile transportation. They are of relatively light weight and are designed to be easily handled. Hence, a mother would find them convenient for use in transporting her baby in any form of public conveyance. Also, they would be useful in other ways, for example, while visiting relatives and friends, while picnicking or vacationing, or while eating in public restaurants.

However, I do not believe that these products are so well adapted to such incidental uses as they are to the use for which they are primarily designed, i. e., for use in private automobiles.[2] Judge Caffrey expressed the point very well in *Rose-Derry,* supra, when he said:

Having in mind that these car beds in fact are exactly what they are called, I find and rule that they are primarily adapted for use in motor vehicles despite the fact that they are also susceptible of being put to certain other uses. It would seem obvious, and I find, that a small car bed of the size of plaintiff's product is not as well adapted for use outside the car as the conventional size crib which is considerably larger and roomier. I find that the use of these car beds in an automobile is their primary use and that use at the beach, or on picnics, or visiting relatives, is a secondary use. 243 F.Supp. 28.

Plaintiff, of course, does not agree with the District Court's analysis and contends that its claim of nontaxability is fully supported by the more recent decision of the Ninth Circuit Court of Appeals in United States v. King Trailer Company, 350 F.2d 947 (9th Cir., 1965), aff'g 228 F.Supp. 1013 (S.D.Cal.1964). There the District Court, in an exhaustive opinion, had held that "pickup coaches" which were designed to be transported in the bed of a pickup truck constituted merely the load being transported and hence were excluded from the "parts or

---

2. Plaintiff's catalog and advertising (see findings 4 and 9, infra) clearly indicate its own belief—originally, at least—that its products were designed primarily for use in automobiles. It has been said that a plaintiff "can hardly be allowed to tell one story to prospective customers and a different story to the tax collector." Mione Mfg. Co. v. United States, 114 F. 2d 647, 649 (3d Cir., 1940).

accessories" tax under the following provision of Regulation 48.4061(b)–2(a):

* * * An article shall not be deemed to be a taxable part or accessory even though it is designed to be attached to the vehicle or to be primarily used in connection therewith if the article is in effect the load being transported and the primary function of the article is to serve a purpose unrelated to the vehicle as such.

The District Court described the "pick-up coach" as similar to a small house trailer except that it had no wheels or chassis. It was especially designed to be mounted and carried in the bed of an ordinary pickup truck. The coach could be easily mounted or removed from the truck, and was designed to provide temporary living quarters, either while mounted on the truck or while dismounted at a destination. The court noted that, although designed to be carried on the truck, the pickup coach did not truly complement the truck's own function or ornament it; that the coach did not depend upon the truck to perform its major function as a residence; and that the coach performed this function equally well whether on or off the truck.

The court concluded at 228 F.Supp. 1020:

* * * a pickup coach is not a taxable part or accessory inasmuch as the coach is the load of the truck and its (primary) use is for living purposes at a campsite or other location rather than in connection with the transportation function of the truck.

The Ninth Circuit affirmed, noting its approval of the "careful reasoning of the district court * * * in its reported opinion." 350 F.2d 947.

It cannot be denied that there is an appealing analogy between the pickup coach and the products involved in this case. Just as the major function of the pickup coach is to provide a nomadic residence, so do the products here have the major function of providing a portable seat or bed for a baby. Neither depends on the automobile for the per-formance of this function. Cf. Aren v. United States, 259 F.2d 757 (9th Cir., 1958), cert. denied, 358 U.S. 866, 79 S.Ct. 100, 3 L.Ed.2d 100 (1958) (where the product could operate only when attached to the automobile). Each performs its function equally well whether in or off the vehicle.

Despite these similarities, however, a crucial distinction between the products exists. In the case of the pickup coach, the primary function of providing a residence is essentially performed at destination, and the truck is merely the means of transporting it there. But in the case of the baby chairs and beds, their primary function of providing a relatively safe and convenient enclosure for a baby is essentially performed while the automobile is in transit. While it is true that they are useful at destination, the uses there are secondary. Adapting the recent words of the Supreme Court in defining the word "primarily," the use while traveling in an automobile is "of first importance." See Malat v. Riddell, 383 U.S. 569, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966). In my judgment, plaintiff has failed in its task of clearly establishing a claim for exemption from taxation. See New Jersey Automobile Club v. United States, 181 F.Supp. 259, 261, 149 Ct.Cl. 344, 346–347 (1960), cert. denied, 366 U.S. 964, 81 S.Ct. 1913, 6 L.Ed.2d 1255 (1961).

In the alternative, plaintiff urges that it has been discriminated against and that the Commissioner of Internal Revenue abused his discretion when, in June 1962, he revoked a 1940 letter-ruling which had held certain of plaintiff's products taxable and certain of them nontaxable. See finding 15, infra. That revocation, says plaintiff, should have been made prospective only but instead was made retroactive to July 23, 1959.

However, plaintiff misconceives the date on which its 1940 ruling was revoked. Plaintiff's ruling, along with any similar rulings to other taxpayers, was actually revoked by the publication of regulations in T.D. 6401, 1959–2 C.B. 258, effective July 23, 1959. The publication

of this Treasury Decision in the Federal Register (24 F.R. 5901) constituted official notice to all concerned and effectively revoked all outstanding rulings inconsistent therewith. Since it specifically mentioned "baby seats for automobiles, automobile beds, etc." as examples of articles taxable as automobile accessories, it appears that it was inconsistent with plaintiff's 1940 ruling and therefore revoked it effective July 23, 1959. The operation of the regulation in this respect was made prospective only by T.D. 6519, 1961–1 C.B. 474.

A former Commissioner of Internal Revenue once remarked:

> Nevertheless, I would caution taxpayers who have received a ruling to be alert to a possible change in our position *without direct notice to them.* With 30,000 to 40,000 separate rulings processed each year, it is not feasible to notify individually every taxpayer of a change in position or interpretation —or, for that matter, a change in law

or regulation—which may affect a prior ruling.

> Aside from a change in law, knowledge of which is imputed to all, there are two general methods of revoking or modifying rulings issued to taxpayers: (1) By direct letter to the taxpayer—but, as noted, this is ordinarily not possible. (2) *By publication in the Internal Revenue Bulletin of a ruling or regulation stating a position different than that in the ruling letter issued to taxpayer.* [Emphasis supplied.] Caplin, Taxpayer Rulings Policy of the Internal Revenue Service, 20 N.Y.Inst. on Fed.Tax. 1, 22 (1962).

It was by the last of the two methods mentioned by Commissioner Caplin that plaintiff's 1940 ruling was revoked on July 23, 1959. Since the Treasury Decision was applied prospectively only, there is no basis for plaintiff's claim of discriminatory retroactivity simply because it first learned of the revocation by a direct letter written in June 1962.